Bushnell *v.* Bushnell.

————————◇————————

BUSHNELL *vs.* BUSHNELL.

The power of the supreme court to issue the writ of *ne exeat* is not impaired or affected by the provisions of the code.

THIS was an appeal, by the defendant, from an order made at a special term, denying the defendant's motion to vacate a writ of *ne exeat,* and discharge the surety. The case, at special term, is reported in 7 *Howard's Prac. Rep.* 389.

*C. P. Kirkland,* for the defendant.

*J. J. Townsend,* for the plaintiff.

*By the Court,* BROWN, J. The principal question involved in this appeal is whether the ancient writ of *ne exeat* has sur-

vived the changes to which it has pleased the legislature to subject the practice of the courts within the last few years. The parties are husband and wife, and the facts set out in the complaint and the affidavit upon which the writ was issued exhibit a most flagrant case of cruelty and desertion on the part of the husband. In the short space of three years it seems he spent the whole of his wife's property, amounting to $6000; he persuaded her to sell her watch and a few other personal articles to furnish him with an outfit to Cincinnati, and reduced her from a useful and respectable position in society to a condition so low that she was driven to perform the most menial services for her daily bread. And while he is in the enjoyment of an income of some $5000 a year, he refuses to contribute any thing to her support, and was at the time the complaint was filed, on the eve of his departure for California, and had taken his passage on board the steamer in the suit of a vocalist of celebrity. The object of the suit is a limited divorce for the causes assigned in the 3d subdivision of section 48 of the act concerning separations or limited divorces, and the facts charged bring the plaintiff's case clearly within the rules which from time immemorial have governed the courts exercising equitable jurisdiction in the application of the writ of *ne exeat*. (*Denton* v. *Denton*, 1 *John. Ch.* 441. *Porter* v. *Spencer*, 2 *Id.* 169. *Woodward* v. *Schatzell*, 3 *Id.* 412. *Mitchell* v. *Bunch*, 2 *Paige*, 606. *Brown* v. *Haff*, 5 *Id.* 235.) "In general the writ of *ne exeat regno* lies only upon equitable debts and claims. There are to this general statement two recognized exceptions, and two only. The one is the case of alimony decreed to a wife, which will be enforced against her husband by a writ of *ne exeat regno*, if he is about to quit the realm; the other is the case of an account in which a balance is admitted by the defendant, but a larger claim is insisted on by the creditor." (2 *Story's Eq. Jur.* 1471.) "In regard to alimony it has been said it arose from compassion and because the ecclesiastical courts could not take bail. (*Id.* 1472.) In former times it was doubtless granted before a decree for alimony had liquidated the sum to be paid by the husband. (*See J. Smithson's case*, 2 *Vent.* 345; *Read* v.

Bushnell v. Bushnell.

*Read,* 1 *Chan. Cas.* 115.) Our court has adopted this rule, but it has been changed in England, and the writ is never allowed there except when there has been a decree of the spiritual court, and then for arrears only. (*Coglar v. Coglar,* 1 *Vesey, jun.* 94. 1 *Hoffm. Ch. Prac.* 93, *n.* 2.) At what particular period this writ was introduced into the practice of the English court of chancery, and to what particular purposes it was originally applied, may be involved in some obscurity ; but none will deny, that the power to issue and apply it to those uses sanctioned by immemorial practice is an essential and indispensable attribute of the equity courts. Without its aid or that of some other equivalent process, the equitable jurisdiction vested in this court by the constitution must fail, and its functions in regard to many subjects of equitable cognizance become useless ; for decrees and orders are senseless and unmeaning ceremonies when the tribunal which makes them is shorn of the power to carry them into execution. Upon the facts before the court in this action the statute authorizes a decree for a separation from bed and board forever, or for a limited time, together with such order and decree for the suitable support and maintenance of the wife by the husband, or out of his property, as the nature of the case renders suitable and proper." But if the husband who owes and has the ability to make this just reparation to his injured wife, cannot be restrained within the jurisdiction of the court during the pendency of the litigation ; if he may withdraw himself to the distant shores of the Pacific, there to enjoy his property, and his ample salary, at his leisure, while she remains to labor as a menial for subsistence, the provisions of the statute are in respect to her a mass of unmeaning words, and any decree which the court might make will be a barren and fruitless proceeding. The argument *ab inconvenienti,* however, will be unavailable in the face of a legislative enactment, and if the power to keep a defendant within the jurisdiction of the court in a case like the present, until a decree can be made, is taken away by the code of procedure, then whatever may be its value, the courts have no other duty but to submit. It is manifest that it is not taken away by express words, and if it

no longer exists its abrogation is to be inferred from the provisions of sections 3, 69 and 178 of the code.

The proceeding which the plaintiff has instituted against her husband is a civil action, as defined in section 69. Section 178 provides that " no person shall be arrested in a civil action, except as provided by this act. But this provision shall not affect the act to abolish imprisonment for debt and to punish fraudulent debtors, passed April 26th, 1831, or any act amending the same, nor shall it apply to proceedings for contempts." The qualifications in the latter clause of the section are worthy of particular observation, because taken in connection with section 179, which defines the cases in which arrests may be made, they indicate the clearest intention on the part of the legislature to leave the law of arrest precisely as it stood before the passage of the code. The whole question turns upon the sense in which the words " arrested in a civil action" are used. If they are to have the largest and widest possible application, then their effect will be to take away the writ of *ne exeat*; but if they are to be used in a more restricted and technical sense, and applied to that class of cases where the mandate and the primary object of the process was the arrest of the defendant and retaining him in custody during the pendency of the action, then the existence of the power to issue the writ is entirely consistent with the provisions of section 178. It is worthy of remembrance that until the revised statutes took effect, in January, 1830, the customary mode of commencing an action in the common law courts was by capias ad respondendum. Suits were in some special and particular cases commenced by original writ, by bill against attorneys and officers of the court, and by declaration against the casual ejector in the mixed action of ejectment; but the rule was almost universal to issue a capias. The command of the writ was to take and safely keep the body of the defendant to answer the plaintiff in the action. From the moment of his arrest until the termination of the action and the satisfaction of the judgment or the discharge of the defendant in some of the forms prescribed by law he was deemed to be in actual custody. He was in the custody of the sheriff until special bail was put

Bushnell *v.* Bushnell.

in and perfected, and from that time forward he was in the custody of his bail to whom he had been delivered. The power of the bail to seize and surrender him at any time and in any stage of the proceedings, upon a certified copy of the bailpiece, wherever he might be found—even in another state—was absolute and complete. This power resulted from the nature of the undertaking. "The bailpiece was not process, or in the nature of process, but merely a record or memorial of the delivery of the principal to his bail, for safe keeping. Bail, in the language of the books, are said to have their principal always upon a string which they may pull whenever they please, and surrender him in their own discharge. They may take him even upon a Sunday and confine him until the next day and then surrender him. The doing so on Sunday was no service of process, but rather like the case where a sheriff arrests a party who escapes ; for that is only a continuance of the former imprisonment. That bail may break open the outer door of the principal, if necessary, in order to arrest him, follows as a necessary consequence from the doctrine that he has the custody of the principal. His power is analogous to that of the sheriff, who may break open an outer door to take a prisoner who has escaped from arrest." (*Nicolls* v. *Ingersoll,* 7 *John.* 145.) Such was the law of arrest upon bailable process, before the code took effect, and upon final process it was more stringent still ; for the mandate of the *capias ad satisfaciendum* was to take the body in satisfaction of the debt, and outside the walls or limits of the gaol the defendant could not go without exposing the sheriff to an action for an escape. I am therefore, I think, justified in assuming that the terms arrest upon mesne or final process, and arrest in a civil action, had a restricted technical signification, and imported the arrest upon process issued against the body of the party and his detention in actual custody until discharged by the termination of the action, the satisfaction of the claim, or the order of some court or officer having authority to release from arrest and imprisonment.

The writ of *ne exeat* bears no resemblance to the mesne or final process of the common law courts. Its primary purpose is

not to arrest the defendant, nor to put him in safe custody during the pendency of the litigation. Such is not its mandate. It commands the sheriff to cause the defendant to come before him and give sufficient security that he will not go without the state into foreign parts without leave of the court. And if he shall refuse to give such security, then to commit him to the common gaol of the county until he do so of his own accord. Until he refuses to give the requisite security he cannot be restrained of his liberty, and when he has given it he may go wherever he pleases, provided he is within the jurisdiction of the court when its process to enforce the decree issues. In the mean time he is not deemed to be in the custody of any person. That the writ was formerly used as a means of enforcing equitable debts, does not affect the argument, for the rule is that when the person of the defendant cannot be taken under the decree by execution or attachment, the writ will not be issued. (*Gleason v. Bisby*, 1 *Clarke*, 551.)

" When the words (of a statute) are not explicit, the intention is to be collected from the context, from the occasion, and the necessity of the law, from the necessity felt, and the remedy in view. And the intention is to be presumed according to what is consonant to reason and good discretion. The words of a statute are to be taken in their natural and ordinary signification and import; and if technical words are used they are to be taken in a technical sense." (1 *Kent's Com.* 462.) The code of procedure is a remedial statute, but no evidence has been or can be produced, that the power of this court to issue the writ of *ne exeat* was regarded as an evil or one of the mischiefs which it was the object of the code to redress. " To revise, reform, simplify and abridge the rules and practice, forms and proceedings of the courts of record of the state," was the sole purpose of the code, and not to disarm the courts of the power to exercise their constitutional functions. In all the statutes designed to mitigate the severity of arrest and imprisonment for debt, the authority of the court of chancery to employ this writ in the exercise of its jurisdiction has been carefully preserved. The act to abolish imprisonment for debt and

to punish fraudulent debtors, passed April 26, 1831, was framed with a view to preserve it untouched ; for the prohibition in the first section is against the arrest or imprisonment of any person " on any civil process issued out of any court of law or on any execution issuing out of any court of equity. In *Brown* v. *Haff*, (5 *Paige*, 235,) the late chancellor had occasion to notice this statute, upon a motion to discharge a writ of *ne exeat*, in these words. " The act to abolish imprisonment for debt does not affect the power of this court to issue a *ne exeat* in any case of equitable cognizance in which it was proper to grant the writ, previous to the passage of the act. The writ was never granted except upon proof, or at least a probable presumption, that the defendant was about to leave the state. The legislature have not thought it expedient to deprive this court of the power of requiring this kind of bail in cases which are clearly of equitable cognizance, when the defendant is about to elude the justice of the court by removing beyond its jurisdiction." Sections 178 and 179, furnish intrinsic evidence of an intention to leave the law of arrest and imprisonment where it was before the code was adopted. Section 178 declares that its provisions shall not affect the right to arrest upon proceedings for contempts, nor in those cases where the power is given in the act to abolish imprisonment for debt. And the five several subdivisions of section 179 enumerate all the other cases in which a defendant might have been arrested under the old law. Whenever the mandate of the writ is made to assume the form of an order, then it may be enforced by attachment for contempt. Mr. Justice Edmonds, in *Forrest* v. *Forrest*, (10 *Barb. S. C. Rep.* 46,) shows " that such is the practice of the English court of exchequer, when an order is made in the first instance that the party within a limited time give security that he will not depart the realm, and in default, that an attachment issue. (*Attorney General* v. *Mucklow*, 1 *Price*, 289.) I concur with him in the opinion that there is " nothing in the code to prevent such a practice, and in case it should be adopted instead of issuing the writ in the first instance, section 178 would clearly warrant an arrest on the attachment as for a contempt." These considera-

tions lead me to the conclusion that the power of this court to issue the writ of *ne exeat* is not impaired or affected by the provisions of the code. I am aware that the superior court of the city of New-York, in *Fuller* v. *Emerie*, (2 *Sandf.* 626,) have pronounced a different opinion, but distinguished as the judgments of that court are for wisdom and learning, I am unwilling to give up the settled convictions of my own mind, upon so grave a question, until the court of appeals shall adjudge that the power in controversy no longer exists.

The decision at the special term should be affirmed, with ten dollars costs.

[Dutchess General Term, July 4, 1853. *Barculo*, *Brown* and *S. B. Strong*, Justices.]